THOMAS P. O'BRIEN
United States Attorney
ROBB C. ADKINS
Assistant United States Attorney
Chief, Santa Ana Office
GREGORY W. STAPLES (CBN 155505)
Assistant United States Attorney
DOUGLAS F. McCORMICK (CBN 180415)
Assistant United States Attorney
      411 W. Fourth Street, Suite 8000
      Santa Ana, California 92701
      Telephone: (714) 338-3535
      Facsimile: (714) 338-3564
      E-mail: greg.staples@usdoj.gov

Attorneys for Plaintiff
United States of America

                UNITED STATES DISTRICT COURT

             FOR THE CENTRAL DISTRICT OF CALIFORNIA

UNITED STATES OF AMERICA,      )   Case No. SA CR 05-214-CJC
                               )
              Plaintiff,       )   **PLEA AGREEMENT FOR DEFENDANT**
                               )   **LEVAR WASHINGTON**
              v.               )
                               )
KEVIN JAMES, et al.,           )
                               )
                               )
              Defendants.      )
                               )
                               )
_____)


     1.  This constitutes the plea agreement between LEVAR

WASHINGTON ("defendant") and the United States Attorney's Office

for the Central District of California ("the USAO") in the above-

captioned case.  This agreement is limited to the USAO and cannot

bind any other federal, state or local prosecuting,

administrative or regulatory authorities.

///

///

///

                                 1

PLEA

2.   Defendant agrees to plead guilty to counts one and five of the indictment in <u>United States v. Kevin James, et al.</u>, SA CR No. 05-214-CJC.

NATURE OF THE OFFENSE

3.   In order for defendant to be guilty of count one, which charges a violation of Title 18, United States Code, Section 2384, the following must be true: (1) two or more persons conspired to levy war against, or oppose by force the authority of, the United States government; (2) the defendant was a member of the conspiracy; and (3) the offense occurred in a state, territory, or place subject to the jurisdiction of the United States.   In order for defendant to be guilty of count five, which charges a violation of Title 18, United States Code, Section 924(c), the following must be true: (1) the defendant committed the crime of conspiracy to levy war against, or oppose by force the authority of, the United States government, a crime of violence, as charged in count one of the indictment; (2) the defendant knowingly possessed a firearm; and (3) the defendant possessed the firearm during and in relation to the crime of violence.   Defendant admits that defendant is, in fact, guilty of these offenses as described in counts one and five of the indictment.

PENALTIES

4.   The statutory maximum sentence that the Court can impose for a violation of Title 18, United States Code, Section 2384 is: 20 years imprisonment; a three-year period of supervised release; a fine of $250,000; and a mandatory special assessment of $100.

The statutory maximum sentence that the Court can impose for a
violation of Title 18, United States Code, Section 924(c) is: a
term of imprisonment of not less than five (5) years nor more
than life and any sentence imposed under this section must be
consecutive to the sentence imposed for count one; a three-year
period of supervised release; a fine of $250,000 or twice the
gross gain or gross loss resulting from the offense, whichever is
greatest; and a mandatory special assessment of $100.00.
Therefore, the total maximum sentence for all offenses to which
defendant is pleading guilty is:  life imprisonment; a three-year
period of supervised release; a fine of $500,000 or twice the
gross gain or gross loss resulting from the offenses, whichever
is greatest; and a mandatory special assessment of $200.00.

5.  Supervised release is a period of time following
imprisonment during which defendant will be subject to various
restrictions and requirements.  Defendant understands that if
defendant violates one or more of the conditions of any
supervised release imposed, defendant may be returned to prison
for all or part of the term of supervised release, which could
result in defendant serving a total term of imprisonment greater
than the statutory maximum stated above.

6.  Defendant also understands that, by pleading guilty,
defendant may be giving up valuable government benefits and
valuable civic rights, such as the right to vote, the right to
possess a firearm, the right to hold office, and the right to
serve on a jury.

7.  Defendant further understands that the conviction in
this case may subject defendant to various collateral

3

consequences, including but not limited to, deportation, revocation of probation, parole, or supervised release in another case, and suspension or revocation of a professional license. Defendant understands that unanticipated collateral consequences will not serve as grounds to withdraw defendant's guilty plea.

## FACTUAL BASIS

8.   Defendant and the USAO agree and stipulate to the statement of facts provided below.  This statement of facts includes facts sufficient to support a plea of guilty to the charges described in this agreement and to establish the sentencing guideline factors set forth in paragraph 12 below.  It is not meant to be a complete recitation of all facts relevant to the underlying criminal conduct or all facts known to defendant that relate to that conduct.

See Attachment A.

## WAIVER OF CONSTITUTIONAL RIGHTS

9.   By pleading guilty, defendant gives up the following rights:

a) The right to persist in a plea of not guilty.

b) The right to a speedy and public trial by jury.

c) The right to the assistance of legal counsel at trial, including the right to have the Court appoint counsel for defendant for the purpose of representation at trial.  (In this regard, defendant understands that, despite his plea of guilty, he or she retains the right to be represented by counsel - and, if necessary, to have the court appoint counsel if defendant cannot afford counsel - at every other stage of the proceedings.)

d)   The right to be presumed innocent and to have the

4

burden of proof placed on the government to prove defendant guilty beyond a reasonable doubt.

e)  The right to confront and cross-examine witnesses against defendant.

f)  The right, if defendant wished, to testify on defendant's own behalf and present evidence in opposition to the charges, including the right to call witnesses and to subpoena those witnesses to testify.

g) The right not to be compelled to testify, and, if defendant chose not to testify or present evidence, to have that choice not be used against defendant.

By pleading guilty, defendant also gives up any and all rights to pursue any affirmative defenses, Fourth Amendment or Fifth Amendment claims, and other pretrial motions that have been filed or could be filed.

<u>WAIVER OF DNA TESTING</u>

10.  Defendant has been advised that the government has in its possession items of physical evidence that could be subjected to DNA testing.  Defendant understands that the government does not intend to conduct DNA testing of any of these items. Defendant understands that, before entering guilty plea pursuant to this agreement, defendant could request DNA testing of evidence in this case.  Defendant further understands that, with respect to the offense to which defendant is pleading guilty pursuant to this agreement, defendant would have the right to request DNA testing of evidence after conviction under the conditions specified in 18 U.S.C. § 3600.  Knowing and understanding defendant's right to request DNA testing, defendant

1  knowingly and voluntarily gives up that right with respect to
2  any items of evidence there may be in this case that might be
3  amenable to DNA testing.  Defendant understands and acknowledges
4  that by giving up this right, defendant is giving up any ability
5  to request DNA testing of evidence in this case in the current
6  proceeding, in any proceeding after conviction under 18 U.S.C. §
7  3600, and in any other proceeding of any type.  Defendant further
8  understands and acknowledges that by giving up this right,
9  defendant will never have another opportunity to have the
10 evidence in this case submitted for DNA testing, or to employ the
11 results of DNA testing to support a claim that defendant is
12 innocent of the offense to which defendant is pleading guilty.

13                          SENTENCING FACTORS

14      11.   Defendant understands that the Court is required to
15 consider the United States Sentencing Guidelines ("U.S.S.G." or
16 "Sentencing Guidelines") among other factors in determining
17 defendant's sentence.  Defendant understands that the Sentencing
18 Guidelines are only advisory, and that after considering the
19 Sentencing Guidelines, the Court may be free to exercise its
20 discretion to impose any reasonable sentence up to the maximum
21 set by statute for the crimes of conviction.
22 ////
23 ////
24 ////
25 ////
26 ////
27 ////
28 ////

12.    Defendant and the USAO agree and stipulate to the following applicable sentencing guideline factors:

| | | | |
|---|---|---|---|
| Base Offense Level : | | 33 | U.S.S.G. § 2A1.5 |
| Adjustments– | | | |
| (Terrorism enhancement) | : | +4 | U.S.S.G. § 3A1.4 |
| (Acceptance of responsibility) | : | -3 | U.S.S.G. § 3E1.1 |
| Total Offense Level : | | 34 | |
| <u>5 years consecutive</u> | | | U.S.S.G. § 2K2.4 |

The USAO will agree to a downward adjustment for acceptance of responsibility (and, if applicable, move for an additional level under § 3E1.1(b)) only if the conditions set forth in paragraph 15) are met.  Subject to paragraph 14, defendant and the USAO agree not to seek, argue, or suggest in any way, either orally or in writing, that any other specific offense characteristics, adjustments or departures, relating to either the applicable Offense Level or the Criminal History Category, be imposed.  If, however, after signing this agreement but prior to sentencing, defendant were to commit an act, or the USAO were to discover a previously undiscovered act committed by defendant prior to signing this agreement, which act, in the judgment of the USAO, constituted obstruction of justice within the meaning of U.S.S.G. § 3C1.1, the USAO would be free to seek the enhancement set forth in that section.  Defendant also understands that defendant's base offense level could be increased if defendant is a career offender under U.S.S.G. §§ 4B1.1 and 4B1.2.  In the event that defendant's offense level is so altered, the parties are not

bound by the base offense (or adjusted offense) level stipulated to above.

13.  There is no agreement as to defendant's criminal history or criminal history category.

14.  The stipulations in this agreement do not bind either the United States Probation Office or the Court.  Both defendant and the USAO are free to: (a) supplement the facts by supplying relevant information to the United States Probation Office and the Court, (b) correct any and all factual misstatements relating to the calculation of the sentence, and (c) argue on appeal and collateral review that the Court's sentencing guidelines calculations are not error, although each party agrees to maintain its view that the calculations in paragraph 12 are consistent with the facts of this case.

<u>DEFENDANT'S OBLIGATIONS</u>

15.  Defendant agrees that he or she will:

    a) Plead guilty as set forth in this agreement.

    b) Not knowingly and willfully fail to abide by all sentencing stipulations contained in this agreement.

    c) Not knowingly and willfully fail to: (i) appear as ordered for all court appearances, (ii) surrender as ordered for service of sentence, (iii) obey all conditions of any bond, and (iv) obey any other ongoing court order in this matter.

    d) Not commit any crime; however, offenses which would be excluded for sentencing purposes under U.S.S.G. § 4A1.2(c) are not within the scope of this agreement.

    e) Not knowingly and willfully fail to be truthful at all times with Pretrial Services, the U.S. Probation Office, and

the Court.

f) Pay the applicable special assessment at or before
the time of sentencing unless defendant lacks the ability to pay.

### THE USAO'S OBLIGATIONS

16.  If defendant complies fully with all defendant's
obligations under this agreement, the USAO agrees:

a) To abide by all sentencing stipulations contained in
this agreement.

b) At the time of sentencing to move to dismiss the
remaining counts of the indictment as against defendant.
Defendant agrees, however, that at the time of sentencing the
Court may consider the dismissed counts in determining the
applicable Sentencing Guidelines range, where the sentence should
fall within that range, the propriety and extent of any departure
from that range, and the determination of the sentence to be
imposed after consideration of the sentencing guidelines and all
other relevant factors.

c) At the time of sentencing, provided that defendant
demonstrates an acceptance of responsibility for the offense up
to and including the time of sentencing, to recommend a two-level
reduction in the applicable sentencing guideline offense level,
pursuant to U.S.S.G. § 3E1.1, and to recommend and, if necessary,
move for an additional one-level reduction if available under
that section.

### BREACH OF AGREEMENT

17.  If defendant, at any time between the execution of this
agreement and the completion of defendant's cooperation pursuant
to the agreement or defendant's sentencing on a non-custodial

sentence or surrender for service on a custodial sentence, whichever is later, knowingly violates or fails to perform any of defendant's obligations under this agreement ("a breach"), the USAO may declare this agreement breached.  For example, if the defendant knowingly in an interview, before a grand jury, or at trial, falsely accuses another person of criminal conduct or falsely minimizes his own role, or the role of another, in criminal conduct, he will have breached this agreement.  If the USAO declares this agreement breached, and the Court finds such a breach to have occurred, defendant will not be able to withdraw defendant's guilty plea, and the USAO will be relieved of all of its obligations under this agreement.  In particular:

a) The USAO will no longer be bound by any agreements concerning sentencing and will be free to seek any sentence up to the statutory maximum for the crime to which defendant has pleaded guilty.

b) The USAO will no longer be bound by any agreements regarding criminal prosecution, and will be free to prosecute defendant for any crime, including charges that the USAO would otherwise have been obligated to dismiss pursuant to this agreement.

c) The USAO will be free to prosecute defendant for false statement, obstruction of justice, and perjury based on any knowingly false or misleading statement by defendant.

18.  Following a knowing and willful breach of this agreement by defendant, should the USAO elect to pursue any charge that was dismissed or not filed as a result of this agreement, then:

10

1    a) Defendant agrees that any applicable statute of

2 limitations is tolled between the date of defendant's signing of

3 this agreement and the commencement of any such prosecution or

4 action.

5    b) Defendant gives up all defenses based on the statute

6 of limitations, any claim of preindictment delay, or any speedy

7 trial claim with respect to any such prosecution, except to the

8 extent that such defenses existed as of the date of defendant's

9 signing of this agreement.

10    LIMITED MUTUAL WAIVER OF APPEAL AND COLLATERAL ATTACK

11    19.  Defendant gives up the right to appeal any sentence

12 imposed by the Court, and the manner in which the sentence is

13 determined, provided that (a) the sentence is within the

14 statutory maximum specified above and is constitutional, (b) the

15 Court in determining the applicable guideline range does not

16 depart upward in offense level or criminal history category and

17 determines that the total offense level is 34 or below, (c) the

18 Court imposes a sentence within or below the range corresponding

19 to the determined total offense level and criminal history

20 category, and (d) the Court imposes a 5-year imprisonment

21 consecutive sentence or less on count five.  Defendant also

22 gives up any right to bring a post-conviction collateral attack

23 on the conviction or sentence, except a post-conviction

24 collateral attack based on a claim of ineffective assistance of

25 counsel, a claim of newly discovered evidence, or a explicitly

26 retroactive change in the applicable Sentencing Guidelines,

27 sentencing statutes, or statutes of conviction.  Notwithstanding

28 the foregoing, defendant retains the ability to appeal the

court's determination of defendant's criminal history category

and the conditions of supervised release imposed by the court,

with the exception of the following: standard conditions set

forth in district court General Orders 318 and 01-05; the drug

testing conditions mandated by 18 U.S.C. §§ 3563(a)(5) and

3583(d); and the alcohol and drug use conditions authorized by 18

U.S.C. § 3563(b)(7).

20.    The USAO gives up its right to appeal the Court's

sentence, provided that (a) the Court in determining the

applicable guideline range does not depart downward in offense

level or criminal history category, (b) the Court determines that

the total offense level is 34 or above, (c) the Court imposes a

sentence within or above the range corresponding to the

determined total offense level, and (d) the Court imposes a 5-

year imprisonment consecutive sentence or more on count five.

<u>RESULT OF VACATUR, REVERSAL OR SET-ASIDE</u>

21.    Defendant agrees that if any count of conviction is

vacated, reversed, or set aside, the USAO may ask the Court to

void the entire plea agreement, with both the USAO and defendant

being released from all of their obligations under this

agreement.

<u>COURT NOT A PARTY</u>

22.    The Court is not a party to this agreement and need not

accept any of the USAO's sentencing recommendations or the

parties' stipulations.  Even if the Court ignores any sentencing

recommendation, finds facts or reaches conclusions different from

any stipulation, and/or imposes any sentence up to the maximum

established by statute, defendant cannot, for that reason,

1   withdraw defendant's guilty plea, and defendant will remain bound

2   to fulfill all defendant's obligations under this agreement.  No

3   one – not the prosecutor, defendant's attorney, or the Court –

4   can make a binding prediction or promise regarding the sentence

5   defendant will receive, except that it will be within the

6   statutory maximum.

7                    NO ADDITIONAL AGREEMENTS

8        23.  Except as set forth herein, there are no promises,

9   understandings or agreements between the USAO and defendant or

10  defendant's counsel.  Nor may any additional agreement,

11  understanding or condition be entered into unless in a writing

12  signed by all parties or on the record in court.

13           PLEA AGREEMENT PART OF THE GUILTY PLEA HEARING

14       24.  The parties agree and stipulate that this Agreement

15  will be considered part of the record of defendant's guilty plea

16  hearing as if the entire Agreement had been read into the record

17  of the proceeding.

18       This agreement is effective upon signature by defendant and

19  an Assistant United States Attorney.

20  AGREED AND ACCEPTED

21  UNITED STATES ATTORNEY'S OFFICE
    FOR THE CENTRAL DISTRICT OF CALIFORNIA
22
    THOMAS P. O'BRIEN
23  United States Attorney

24

    _____/s/_____        _____
25  GREGORY W. STAPLES                           Date
    DOUGLAS F. McCORMICK
26  Assistant United States Attorneys

27

28

1    I have read this agreement and carefully discussed every

2  part of it with my attorney.  I understand the terms of this

3  agreement, and I voluntarily agree to those terms.  My attorney

4  has advised me of my rights, of possible defenses, of the

5  Sentencing Guideline provisions, and of the consequences of

6  entering into this agreement.  No promises or inducements have

7  been made to me other than those contained in this agreement.  No

8  one has threatened or forced me in any way to enter into this

9  agreement.  Finally, I am satisfied with the representation of my

10 attorney in this matter.

11

12

13 _____/s/_____    _____

14 LEVAR WASHINGTON                        Date
   Defendant

15

16    I am LEVAR WASHINGTON's attorney.  I have carefully

17 discussed every part of this agreement with my client.  Further,

18 I have fully advised my client of his rights, of possible

19 defenses, of the Sentencing Guidelines' provisions, and of the

20 consequences of entering into this agreement.  To my knowledge,

21 my client's decision to enter into this agreement is an informed

22 and voluntary one.

23

24 _____/s/_____    _____

25 ELLEN BARRY, ESQ.                       Date
   Counsel for Defendant
26 LEVAR WASHINGTON

27

28

                                    14

**ATTACHMENT A**

Beginning in at least December 2004 and continuing to July 5, 2005, defendant conspired with co-defendants Kevin James ("James"), Gregory Patterson ("Patterson"), and Hammad Samana ("Samana") to levy war against the government of the United States through terrorism, and to oppose by force the authority of the United States government.  Defendant, Patterson, and Samana planned to do so by carrying out attacks on United States military recruiting stations and bases, and targets associated with Israel or the Jewish religion in the Los Angeles area.  The object of the attacks was to kill as many people as possible who were present at the locations.  For example, defendant, Patterson, and Samana planned to attack synagogues in the Los Angeles area on Jewish holidays to increase the number of victims.  To carry out the attacks, Patterson purchased a shotgun and a rifle.  The shotgun was also used to rob gas stations to finance the conspiracy.

Defendant, James, Patterson, and Samana were members of Jam'iyyat Ul-Islam Is-Saheeh ("JIS"), a group formed and directed by James.  One of the stated goals of JIS was to wage armed struggle or jihad against the government of the United States, Israel, and Jewish people, in retaliation for the policies of the United States and Israeli governments toward Muslims throughout the world.  The planned attacks on Los Angeles-area United States and Israeli government targets, and on targets related to the Jewish religion, were part of the group's jihad against the governments of the United States and Israel.

In furtherance of the conspiracy, James wrote and disseminated a document referred to as the "JIS Protocol."  In the JIS Protocol James advocated the establishment of an Islamic Caliphate in the United States.  The JIS Protocol states that "Muslims must be allowed to govern themselves by Shariah and if not we are being oppressed . . . yet we must wage the educational as well as the Organizational War or Jihad."  The JIS Protocol purports to lay out the criteria for "this task."  James described "Jihad [as] the only true 'anti-terrorist action'[,] a defensive battle against the aggression of theological impostors led by Zionism."

The JIS Protocol further states that the "faithful mujahid are strictly forbidden to obey Kafirs or disbelievers, in fact they are commanded by Allah to battle against disbelievers . . . utilizing most strenuous effort."  James wrote about "Shia usurpation" of the name Hezbollah in Lebanon, and claimed that JIS would "sit back, build and attack!!!  Our obvious targets being the Western forces of the US and their Kufr [sic] society, Russia, Serbia, Brittain [sic] and Isreal [sic]."  The JIS Protocol states that "[i]t is important that the forementioned [sic] objectives be carried out, we are not concerned with the numbers of recruits to this movement, which was a mistake of many before us that led to the many degrees of compromise and infiltration, nor are we concerned with the lost [sic] of life in

1    the pursuit of our objectives; for martyrdom Fee Sabil Allah is
automatic paradise."

2

3      James also wrote in the JIS Protocol of the need for
secrecy.  In one section it discusses a probationary period of
six months for new recruits and that the "security and

4    clandestine movement of our group must be safeguarded hence
correspondence is imperative."

5

6      James also wrote a document called "Blueprint 2005" which
set forth the following goals for members of JIS:

7          •      learn Arabic;

8          •      acquire a steady job that does not interfere with
learning Arabic;

9

10         •      recruit five "special operations members, preferably
felony free";

11         •      "acquire two <u>Weapons (pistols)</u> with <u>silencers</u>";

12         •      "appoint <u>a</u> member (<u>from the five</u>) to <u>find contacts for</u>
<u>explosives or to learn bombmaking</u>.  We will need bombs

13              that can be <u>activated from a distance</u>";

14         •      and "In order to fulfill these task [sic] you must
become legitimate.  Acquire identification, drivers

15              license, work/school, keep regular contact with your
parole agent, attempt to remove your tatoos and <u>monitor</u>

16              <u>your look</u>.  Your dress code must not bring attention .
. . <u>casual dress so as not to arouse 'extremist</u>

17              <u>suspicion</u>.'  We have work to do."

18      James also directed JIS members to contact him every ninety
days: "<u>Never</u> violate three month contact agreement which means

19    that you must <u>never fall out of contact with me directly for any</u>
<u>time exceeding 90 days</u>."  The Blueprint concludes as follows:

20

21              May Allah grant us victory through you, for
<u>our sole purpose for residence in Dar ul-Harb</u>

22              [house of war] has been outlined: 'O you who
believe!  Endure and be more patient (than

23              your enemy), and <u>guard your territory by</u>
<u>stationing army units (*J.I.S.)</u> Permanently

24              at the place from where the enemy can attack
you <u>(*U.S.A.)</u>, and fear Allah, so that you

25              may be successful' 3:200.

26      James also wrote a document called the "Notoriety Moves,"
which included a proposed statement to the press following
attacks by JIS members.  That document stated:  "On missions that

27    are done for leaving impressions the following letter will be
left behind and if 187's [a reference to California homicide

28    statute] are involved a video tape with one of our spokesman

16

wrapted [sic] in a turban will recite this letter and be sent to
all major news stations." The proposed letter reads as follows:

This incident is the first in a series of
incidents to come in a plight to defend and
propagate traditional Islam in its purity.
We advise those sincere believers in Allah
and followers of the Sunnah of his Messenger
to teach their children the importance of
staying within the bounds of the Shariah
because if you as parents won't inforce [sic]
it, the community will. We also advise those
sincere Muslims of the ahl-Sunnah wa'l
Jama'at to abstain from socializing and or
aiding the following targets of Jama'at
Islami As-Sahih:

* The so-called Nation of Islam and its
idol worshiping supporters of Farrakhan.
* The so-called "American-Muslims" or
those who follow Warith D. Muhammed's
transgression against traditional Islam
and the Sunnah (Hadith) of the Messenger
of Allah (saw).
* Those so-called Muslims who trash the
four schools of Islamic law and
qualified scholarship in Islam.
* Those so-called Muslims labelled [sic]
Shi'i, and supporters of the infidel
state of Iran.
* Those so-called Muslims who believe it
permissible to join or support the
American Army (military) in any way.
* Those so-called Muslims who are
employees of non-Islamic government
institutions that are blatantly in
opposition to the laws and religion of
Islam.
* Those Jewish and non-Jewish supporters
of an Israeli state.

All who fall under the previously mention has
[sic] a legitimate reason to fear for their
safety. We are not extremists, radicals, or
terrorists. We are only servants of Allah
and lovers of the Sunnah, our actions will
gladly be corrected with proof from Islamic
sources . . . Once again, I advised [sic] the
masajid of America to hire or seek qualified
imams to govern over your Islamic centers and
restore Islamic Shariah to your areas. If by
doing this you come into opposition from
local law enforcement then know that it's
time for you to migrate. Allahu Alim!

17

Jama'at Islami As-Sahih

James recruited defendant into JIS, and had defendant swear an oath of loyalty and obedience to James and JIS.  In furtherance of the conspiracy, defendant recruited Patterson and Samana into JIS and had them swear oaths of allegiance and obedience to defendant and JIS.  Defendant decided that gas stations would be robbed to supply money for the group's planned attacks in the Los Angeles area.  Defendant and Patterson participated in numerous armed robberies of gas stations in fulfillment of this plan.

In furtherance of the conspiracy, Samana researched targets for attack, and wrote them down on a document called "Modes of Attack," attached as Exhibit 1.  The document included the following notations: "LAX and Consulate of Zion" listed under the heading of "Options"; "Military Targets" with two addresses listed underneath it; "Army Recruiting centers throughout the county" written under the "Military Targets" notation, followed by multiple addresses in Los Angeles; "Military base in Manhattan Beach" and then some additional addresses; and "Campsite of Zion."

Samana drove the getaway car for defendant on several armed gas station robberies.

In furtherance of the conspiracy, defendant committed the following acts, among others, in Los Angeles and Orange Counties:

a.  On or about June 6, 2005, defendant, armed with a shotgun, and Patterson, who drove the getaway car, robbed a gas station in Torrance, California.

b.  On the night of July 4, 2005, defendant, Patterson, and Samana went to Kenneth Hahn Park in Los Angeles and engaged in target practice as part of their preparation for attacks in the Los Angeles area.

c.  On or about July 5, 2005, defendant, armed with a shotgun, and Patterson, who drove the getaway car, robbed a gas station in Fullerton, California.

Defendant admits that the above-listed overt acts were in furtherance of the conspiracy to retaliate against the governments of the United States and Israel by attacking targets in Southern California associated with the U.S. military and the Jewish religion.